**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Marie Louise SEILHAMER, Appellant.**

Superior Court of Pennsylvania.

Submitted June 28, 2004.

Filed Nov. 23, 2004.

---

Thomas M. Dickey, Altoona, for appellant.

David C. Gorman, Asst. Dist. Atty., Holidaysburg, for Com., appellee.

BEFORE: BENDER, KELLY, and JOHNSON, JJ.

OPINION BY KELLY, J.:

¶ 1 Appellant, Marie Louise Seilhamer, appeals from the judgment of sentence entered in the Blair County Court of Common Pleas, following her convictions for first-degree murder[1] and criminal conspiracy.[2] Appellant asks us to determine, *inter alia*, whether the trial court should have suppressed her incriminating pre-arraignment statements to the police, where the police arrested her but did not arraign her until more than twelve hours later. After examining the totality of the circumstances surrounding Appellant's arrest and arraignment, we conclude Appellant voluntarily made her pre-arraignment statements. Accordingly, we affirm her judgment of sentence.

¶ 2 The relevant facts and procedural history of this case are as follows. On the evening of May 5, 2001, Appellant's co-defendant Kristin Edmundson picked up Appellant from work in a truck, accompanied by the victim Shari Jackson. Prior to this rendezvous, Appellant and Edmundson had allegedly conspired to kill Jackson, due to her romantic involvement with Edmundson's roommate.

¶ 3 While traveling on Janesville Pike, Edmundson stopped the truck under the pretense of mechanical difficulty. The three exited the truck, whereupon Appellant struck Jackson several times with a baseball bat. Edmundson then sliced Jackson's throat multiple times with a razor blade. During or immediately after Edmundson's attack, Appellant hit Jackson again with the bat. Jackson died as a result of wounds sustained from these attacks. Appellant and Edmundson threw Jackson's body into the back of the truck, drove to another location, and dumped the body. The following day, Edmundson returned to the body and set it on fire. The burning body attracted the Pennsylvania

1. 18 Pa.C.S.A. § 2502.

2. 18 Pa.C.S.A. § 903.

State Police, whose investigation led to Appellant and Edmundson.

¶ 4 At 6:15 a.m. on May 7, 2001, state police took Appellant to the State Police Barracks. After questioning Appellant, the police formally arrested her at 4:00 p.m. that same day. Appellant was arraigned four hours later at 8:00 p.m.

¶ 5 Appellant filed a motion to suppress the statements she made to the police, which the trial court denied after a hearing in an order and opinion dated April 26, 2002. On May 9, 2003, a jury convicted Appellant of the aforementioned charges. On July 1, 2003, the court sentenced Appellant to life imprisonment on the murder conviction plus a consecutive ten to twenty years for the conspiracy count. Appellant filed a post-sentence motion, which the trial court denied in an opinion and order filed November 12, 2003. This timely appeal followed.

¶ 6 Appellant raises the following issues for our review:

WHETHER [APPELLANT] SHOULD HAVE HAD THE BENEFIT OF A COURT APPOINTED PSYCHIATRIST TO AID IN HER DEFENSE?

WHETHER STATEMENTS MADE BY [APPELLANT] BETWEEN THE TIME OF HER ARREST AND HER PRELIMINARY ARRAIGNMENT SHOULD HAVE BEEN SUPPRESSED?

WHETHER THE TRIAL COURT ERRED IN REFUSING TO ADMIT CERTAIN STATEMENTS AND/OR DECLARATIONS AGAINST INTEREST MADE BY THE CO–DEFENDANT ... EDMUNDSON?

WHETHER A NEW TRIAL SHOULD BE GRANTED BECAUSE THE STATE POLICE FAILED TO PRESERVE NOTES THAT WERE TAKEN WHEN [APPELLANT] WAS MAKING STATEMENTS?

(Appellant's Brief at 2).

 ¶ 7 Appellant first argues she had a head injury that may have been extensive enough to interfere with her ability to form the specific intent to kill Jackson. Appellant complains the trial court should have granted her request for a psychiatrist to investigate this alleged mental deficiency. Appellant concludes the court's failure to appoint her a psychiatrist warrants the grant of a new trial. We disagree.

 ¶ 8 The decision to appoint an expert witness in a criminal case is within the sound discretion of the trial court, and we will not disturb its determination absent a clear abuse of that discretion. *Commonwealth v. Abdul–Salaam*, 544 Pa. 514, 535, 678 A.2d 342, 352 (1996), *cert. denied*, 520 U.S. 1157, 117 S.Ct. 1337, 137 L.Ed.2d 496 (1997). In a capital case, however, "a defendant is entitled to the assistance of experts necessary to prepare a defense." *Id.*

¶ 9 Instantly, the trial court addressed this issue as follows:

In [Appellant's] Motion to Appoint Forensic Psychologist and Psychiatrist, [Appellant] failed to raise any issue of a head injury. Specifically, [Appellant] averred, "serious issues have been raised concerning the state of mind as well as the mental and emotional stability of [Appellant] at all relevant times associated with these offenses. Due to these factors as well as all attendant circumstances surrounding [Appellant], a psychological evaluation as well as other review by forensic psychologists

**and/or** forensic psychiatrists." ([Appellant's] Supplemental Pre-trial Motion, ¶ 12) (emphasis added).

Court appointed experts are within the sound discretion of the trial court. [Appellant] was not entitled to an endless stream of experts; just those reasonably related to the facts and circumstances of the case. [Appellant] never mentioned a head injury in her motion for experts. She was not receiving psychiatric treatment prior to her arrest. And she never raised the defense of mental infirmity, which according to the Pennsylvania Rule of Criminal Procedure 573(c)(1)(b), [Appellant] needed to raise within thirty days of her arraignment. Therefore, we did not feel both a psychologist and a psychiatrist were necessary.

In regard to this case, [Appellant] requested the appointment of five experts: a forensic pathologist, a forensic psychologist, a forensic psychiatrist, a capital mitigation specialist, and co-counsel (death qualified). We granted three of those requests by appointing Dr. Walter Hofman, a forensic pathologist; Dr. Marc J. Tabackman, a forensic psychologist; and James DeFrancesco, Jr. Esquire, death qualified co-counsel. The County of Blair spent almost $20,000.00 in defense experts. [Appellant] clearly received the benefit of an expert opinion for the jury to consider.

(Trial Court Opinion, filed November 12, 2003, at 3–4) (footnote omitted). After a thorough review of the record, we agree with the trial court that Appellant had the assistance of experts necessary to prepare her defense. *See Abdul–Salaam, supra.* Thus, this issue is without merit.

¶ 10 Next, Appellant argues she was arrested at 6:15 a.m. on May 7, 2001, when the police accompanied her to the State Barracks, not at 4:00 p.m. later that day. Thus, Appellant contends her 8:00 p.m. arraignment was not held within six hours of her arrest, in violation of the six-hour rule announced in *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977). Appellant concludes the trial court should have suppressed all of the statements she made during the "16 hour delay" between her 6:15 a.m. arrest and her 8:00 p.m. arraignment. We disagree.

■ ¶ 11 When reviewing the denial of a motion to suppress:

We must first ascertain whether the record supports the factual findings of the suppression court, and then determine the reasonableness of the inferences and legal conclusions drawn therefrom. In reviewing the denial of a motion to suppress evidence, we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. When the evidence supports the suppression court's findings of fact on a motion to suppress, this Court may reverse only when the legal conclusions drawn from those facts are erroneous. However, we are bound by the trial court's findings of fact only to the extent that they are supported by the record.

*Commonwealth v. Valentin,* 748 A.2d 711, 713 (Pa.Super.2000), *appeal denied,* 564 Pa. 731, 766 A.2d 1247 (2000) (quoting *Commonwealth v. Long,* 455 Pa.Super. 337, 688 A.2d 198, 199–200 (1996)).

¶ 12 Under the old rule set forth in *Davenport, supra,* and *Commonwealth v. Duncan,* 514 Pa. 395, 525 A.2d 1177 (1987), a court had to suppress incriminating statements made by an accused more than six hours after her arrest. However, in

*Commonwealth v. Perez,* 577 Pa. 360, 845 A.2d 779 (2004), the Pennsylvania Supreme Court expressly rejected the *Davenport–Duncan* "six-hour rule" and adopted a totality of the circumstances test.[3] The Court has recently explained the new *Perez* test as follows:

> [T]he [*Perez*] majority abandoned the six-hour rule and held that voluntary statements by an accused, given more than six hours after arrest when the accused has not been arraigned, are no longer inadmissible *per se.* Instead, the majority in *Perez* concluded that courts should look to the totality of the circumstances to determine whether a pre-arraignment statement was freely and voluntarily made, and therefore admissible. The majority explained that, in making this determination, courts should consider factors such as the attitude exhibited by the police during the interrogation, whether the defendant was advised of his constitutional rights, whether he was injured, ill, drugged or intoxicated when he confessed, and whether he was deprived of food, sleep, or medical attention during the detention.

*Commonwealth v. Sepulveda,* —— Pa. ——, ——, 855 A.2d 783, 792–93 (2004) (citations and quotation marks omitted).

 ¶ 13 The test to determine whether a suspect is being subjected to custodial interrogation, the functional equivalent of an arrest, is:

> whether he or she is physically denied of his [or her] freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. The stan-

dard for determining whether police have initiated a custodial interrogation or an arrest is an objective one, with due consideration given to the reasonable impression conveyed to the person interrogated rather than the strictly subjective view of the troopers or the person being seized. Whether an encounter is deemed custodial must be determined with reference to the totality of the circumstances.

*Commonwealth v. Pitts,* 740 A.2d 726, 731 (Pa.Super.1999) (citations and quotation marks omitted).

 ¶ 14 In the present case, Trooper David Snyder and another trooper arrived at Appellant's home at approximately 5:35 a.m. on May 7, 2001. (N.T. Suppression Hearing, 10/12/01, at 3). Trooper Snyder asked Appellant if she would accompany him to the state police barracks to answer some questions about the burning body found by the police. (*Id.* at 8). Appellant voluntarily drove with Trooper Snyder to the police barracks, arriving at approximately 6:15 a.m. After they arrived, Trooper Snyder escorted Appellant to an interview room and informed her of her *Miranda* rights. (*Id.* at 15). Appellant signed a *Miranda* rights warning form, and then confessed that she and Edmundson assaulted Jackson with a baseball bat and a razorblade on the evening of May 5th. (*Id.* at 15–18).

¶ 15 At that point, Trooper Snyder asked Trooper David Aiello to locate Edmundson and ask if she would come to the barracks for questioning. (*Id.*) Trooper Snyder subsequently asked Appellant to repeat her account of the incident, so that he could tape-record her statement. (*Id.*

---

**3.** The Court announced the *Perez* totality of the circumstances test applies to all pending

cases where the issue has been properly raised. *Id.* at 374, 845 A.2d at 788.

at 19). Appellant agreed, and Trooper Snyder re-advised Appellant of her *Miranda* rights before recording her statement, which lasted from 6:50 a.m. to 7:28 a.m. (*Id.*) While giving this statement, Appellant agreed to show the police the crime scene. Consequently, Trooper Roger Smith and another trooper escorted Appellant to the crime scene at 8:00 a.m. (*Id.* at 124). The police returned her to the barracks at approximately 11:00 a.m., at which time Trooper Smith told Trooper Snyder additional details Appellant had revealed during their visit to the crime scene. (*Id.* at 58–59). Trooper Smith then re-read Appellant her *Miranda* rights and took another recorded statement from her, which lasted from 12:24 to 12:43. (*Id.*) At 4:00 p.m., Trooper Snyder informed Appellant he was filing charges against her and she was not free to leave. (*Id.* at 139). From approximately 12:45 p.m. until 8:00 p.m., when Trooper Snyder took her for arraignment, Appellant sat in the barrack's conference room with her family and Trooper Smith. (*Id.* at 131–33).

¶ 16 Trooper Snyder testified he would not have allowed Appellant to leave police custody as of 7:28 a.m. (*Id.* at 120–21). In fact, he stated he could have charged Appellant and arraigned her at that time. (*Id.* at 150). From the time Trooper Snyder appeared at Appellant's house at 5:35 a.m., until her formal arrest at 4:00 p.m., the police took at least three incriminating statements from Appellant and gave her three *Miranda* warnings. The police also escorted Appellant to the crime scene, and then returned her to the barracks. Except for trips to the bathroom, Appellant was subject to continuous police supervision the entire day, and did not leave the barracks except to accompany the police to the crime scene. Under these circumstances, we conclude Appellant could have

reasonably believed she was not free to leave police custody as early as 7:28 a.m., after Trooper Snyder read her the *Miranda* warnings and she implicated herself in the murder. *See Pitts, supra.* We now look to the totality of the circumstances surrounding Appellant's pre-arraignment statements to determine whether they were freely and voluntarily made. *See Perez, supra.*

¶ 17 Although Trooper Snyder had enough evidence to arrest and arraign Appellant at 7:28 a.m., he gave the following testimony to explain the delay:

[TROOPER SNYDER]: I was preparing the case to file charges during that time frame.

[DEFENSE COUNSEL]: O.K. what do you mean preparing the case to file charges?

[TROOPER SNYDER]: Well I have, I have to communicate with the people that are at the crime scene to make sure that the evidence we have at the scene is consistent with what they're telling us.

* * *

The investigation is ongoing at that time. I have multiple crime scenes. I have people serving search warrants at different locations throughout the day. I'm gathering all those facts so that when I sit down to prepare a criminal complaint it makes some semblance of sense to someone's whose going to read it. Obviously this is a most serious crime.

* * *

Like I said before I'm trying to obtain information from the troopers who are at the scenes of the numerous tasks that

are taking place. We have people trying to locate [witnesses], we have search warrants being served at the Edmundson residence or are about to be served at the Edmundson residence some time that afternoon. We have two crime scenes. We have a vehicle being searched. We have probably 15 to 20 investigators involved in this investigation at that time and I'm trying to get a handle on everything we know to try to put that into a probable cause affidavit, what we know at that point.

(N.T. Suppression Hearing at 133, 144–45). There is no evidence the delay in Appellant's arraignment was intended to wear her down or overcome her will. Further, there is no evidence the police utilized coercive tactics to persuade Appellant to give any of her incriminating statements. The police gave Appellant *Miranda* warnings on at least three occasions, before each one of her incriminating statements. Under these circumstances, we conclude Appellant's pre-arraignment statements were voluntarily given. *See Sepulveda, supra; Perez, supra.* Thus, the trial court properly denied Appellant's suppression motion. *See Valentin, supra.*

¶ 18 Next, Appellant argues the trial court should have allowed her to impeach co-defendant Edmundson's properly admitted hearsay statements with Edmundson's "out-of-court recorded statements which were in many ways inconsistent with the statements brought into evidence by the police officers who worked the case." (Appellant's Brief at 10). Appellant believes her constitutional rights were violated when the court did not allow her to impeach Edmundson's statements with other recorded statements. For this reason, Appellant concludes she is entitled to a new trial. We disagree.

¶ 19 When reviewing questions regarding the admissibility of evidence, our standard of review maintains the "admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion." *Commonwealth v. Cunningham*, 805 A.2d 566, 572 (Pa.Super.2002), *appeal denied*, 573 Pa. 663, 820 A.2d 703 (2003). "[A]n abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence or the record." *Commonwealth v. Cameron*, 780 A.2d 688, 692 (Pa.Super.2001). The comment to Rule 403 of the Pennsylvania Rules of Evidence defines "unfair prejudice" as "a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403, comment.

¶ 20 Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). "Hearsay testimony is *per se* inadmissible in this Commonwealth, except as provided in the Pennsylvania Rules of Evidence by other rules prescribed by the Pennsylvania Supreme Court, or by statute." *Cunningham, supra* at 572; Pa.R.E. 802.

¶ 21 A hearsay statement against interest is admissible if the declarant is unavailable as a witness. Pa.R.E. 804(b)(3). In addition, the co-conspirator exception to the hearsay rule "allows statements by a co-conspirator to be admitted against an accused if the statements are

made during the conspiracy, in furtherance thereof, and where there is in other evidence of the existence of the conspiracy." *Commonwealth v. Cull*, 540 Pa. 161, 172–73, 656 A.2d 476, 481 (1995).

¶ 22 Instantly, the trial court resolved this issue as follows:

[Appellant and Edmundson] conspired to commit criminal homicide. The statements [Appellant] sought to admit are statements [Edmundson] made to the police after she and [Appellant] completed the conspiracy. Therefore, [Edmundson's] statements do not fall within the co-conspirator exception to the hearsay rule. In addition, [Edmundson's] statements do not fall under the Statement Against Interest exception the hearsay rule since [Edmundson] (the declarant) was available to testify at [Appellant's] trial but [Appellant] failed to present her as a witness. See Pa.R.E. 804(b)(3).

Since the exclusion of the statements was not contrary to law, such exclusion did not deny [Appellant] a right to a fair and impartial trial as guaranteed by the United States and Pennsylvania Constitutions.

(Trial Court Opinion at 6–7). We agree with the trial court's conclusion that Edmundson's out-of-court statements were inadmissible as hearsay not falling within any of the exceptions. *See* Pa.R.E. 804; *Cull, supra; Cunningham, supra.* Thus, this issue is without merit.

 ¶ 23 In her last argument, Appellant focuses on statements she made to Officer Smith while he accompanied her to the crime scene on the morning of May 7th. Appellant contends her statements to Officer Smith were inconsistent with the recorded statements she gave to Officer Snyder. Appellant complains Officer Smith destroyed the notes he took of this conversation. Appellant claims the destruction of this "potentially" exculpatory evidence should have resulted in a mistrial. Appellant also avers Trooper Smith testified "to events and statements that were not included in discovery and that were inconsistent with other statements made by Appellant and [Edmundson]." (Appellant's Brief at 13). For these reasons, Appellant concludes this Court should award her a new trial. We disagree.

¶ 24 The trial court addressed this argument as follows:

The Pennsylvania State Police took a series of statements from [Appellant], recorded and unrecorded. At trial, Troopers David Snyder and Roger Smith testified that [Appellant] gave inconsistent statements. The jury heard the recorded statements and the State Police destroyed their notes of the unrecorded statements. [Appellant] argues that to destroy notes is to destroy vital evidence, which may have been exculpatory.

The State Police investigators testified they incorporated the notes they took while talking with [Appellant] into their subsequent reports. [Appellant] received the police reports pursuant to pretrial discovery. [Appellant] failed to provide any law whatsoever that the police have some obligation to remain in possession of their notes. The question of whether there were inconsistencies between [Appellant's] recorded and unrecorded statements and the nature of the inconsistencies, if any, became an issue of weight and credibility for the jury. Therefore, the Pennsylvania State Police's destruction of their notes does not warrant a new trial or an arrest of judgment.

(Trial Court Opinion at 7–8). While we would caution against the destruction of any evidence that might be relevant to a suspect's criminal defense, we nevertheless

agree with the trial court that the destruction of the notes in the present case does not warrant a new trial. Any question about the weight accorded to Officer Smith's testimony was for the jury as fact finder to determine. *See Commonwealth v. Lyons,* 833 A.2d 245, 259 (Pa.Super.2003) (explaining this Court will not substitute our judgment concerning issues of credibility and weight of evidence for that of fact finder).

¶ 25 For the foregoing reasons, we hold Appellant had the assistance of experts necessary to prepare her defense. After examining the totality of the circumstances surrounding her arrest and arraignment, we also hold Appellant voluntarily made her incriminating pre-arraignment statements to the police. Finally, we conclude Edmundson's out-of-court statements were inadmissible hearsay, and Officer Smith's destruction of his notes did not warrant a new trial. Accordingly, we affirm Appellant's judgment of sentence.

¶ 26 Judgment of sentence affirmed.